**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-CR-58 (BAH)** |
| | : | |
| **BRANDON HARGRAVES,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Suppress Evidence and Statements. Because the officers did not unlawfully seize or search the defendant and no violation of *Miranda* occurred, the defendant's motion should be denied.

**PROCEDURAL BACKGROUND**

In this case, the defendant, Brandon Hargraves (hereinafter "defendant"), is charged by indictment with Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year (18 U.S.C. § 922(g)(1)) (ECF No. 1). On September 29, 2021, the defendant filed his Motion to Suppress Evidence and Statements (hereinafter "the defendant's motion") (ECF No. 40 and No. 44). The case is currently scheduled for a Motions Hearing on December 9, 2021.

## BACKGROUND[1]

On Thursday, December 31, 2020, at approximately 6:43 p.m., members of the Metropolitan Police Department (MPD) Seventh District Crime Suppression Team (7D CST) were in a vehicle on patrol when they observed a car backed into a handicap parking space on the 3500 Block of 22nd Street, SE, Washington, DC. The officers had just pulled into the small parking lot and recognized that the vehicle had no front tag or handicap placard of any kind. Officer Smith observed the defendant with a wide-eyed look once he saw the police officers inside their vehicle. As the officers exited their vehicle and began approaching the defendant, he started to roll up the tinted driver's side window, while moving his right arm down and to the right, at which point officers instructed him to roll down the window so that they could speak with him.

Officer Smith was at the driver side window, Officer Jeskie was on the passenger side of the vehicle, and defendant Hargraves was the sole occupant of the vehicle in the driver's seat. While speaking with the defendant, Officer Smith could see a red and black box of ammunition in the driver's side door pocket (map pocket); this box of ammunition was readily identified by the fact that the box read "RIFLE" on it. At this point in time, Officer Smith gave the predetermined code word for the presence of a firearm. Officers attempted to open the driver's door, but the car was locked.  Officers were able to reach in through the window, unlock the door, and open the door to have the defendant step out from the vehicle.  As officers were removing the defendant from the vehicle, Officer Jeskie had come in through the passenger side door to assist. While inside

---

[1]     This factual summary is being provided only as background information to aid the Court in considering the defendant's motion at issue and the government's response in this pleading. It is not a complete description of all the facts, statements, and evidence that might be established and admitted at a hearing on the defendant's motion or at trial. Furthermore, the encounter with the defendant was captured on police body-worn camera footage. Relevant portions of the footage will be played at the hearing on the defendant's motion.

the cabin of the car to assist restraining the defendant, Officer Jeskie observed the floor plate of a firearm magazine facing up from the position where it was wedged between the driver's seat and the center console.  Officer Jeskie looked further and could then see the rest of the firearm between the seat and console.  The recovered firearm was a black Taurus PT 809 9mm handgun with a serial number of T1Y89022. When it was recovered it had sixteen (16) rounds in a seventeen (17) round high-capacity magazine.





*Photographs of the firearm and ammunition, as well as the "RIFLE" box exterior and interior.*

After the defendant had been removed from the vehicle and placed into custody, the officers and defendant were waiting for another transport vehicle to arrive. During this time, while waiting for transport, he spontaneously said "I mean you know how the streets is, man. You ain't about to ride around naked. Dudes drive up, pull up to you."

This interaction, along with the stop, was captured on officer body-worn camera. As part of this motion, and in anticipation of an evidentiary hearing, the government submits the following exhibits for the Court's consideration:

Exhibit A: MPD Officer Anthony Smith's BWC from 1:45-3:15

Exhibit B: MPD Officer John Jeskie's BWC from 2:00-3:25

## ARGUMENT

The defendant argues that the police unconstitutionally seized him and searched his vehicle without probable cause, and specifically compares this case with *United States v. Delaney,* 955 F.3d 1077 (D.C. Cir. 2020). Additionally, the defendant contends in one paragraph that the defendant's statements were taken in violation of his Fifth and Sixth Amendment rights. Both claims lack merit for the reasons described below.

Here, police indisputably had probable cause to conduct a *Terry* stop of the defendant and his vehicle based on the missing front tag and lack of a handicap placard. Indeed, they would have been permitted to step the defendant out of his vehicle in order to conduct the *Terry* stop. However, before they could even step the defendant out of the car, Officer Smith observed an ammunition box in plain view which, along with the other circumstances of their interaction with the defendant, provided the officer's probable cause to arrest the defendant and search the vehicle.

With respect to the defendant's statements, the defendant has not identified any specific statements that he seeks to suppress and generally requests that the court suppress "any and all

uncounseled statements." Def. Mot. at 4. The statements made by the defendant were not made involuntarily or obtained in violation of *Miranda*, but in fact were spontaneous, and therefore would be admissible at trial.

## I.  THE OFFICERS' ENCOUNTER WITH THE DEFENDANT DID NOT VIOLATE THE FOURTH AMENDMENT.

### A.  The Officers Had Reasonable Articulable Suspicion to Briefly Seize the Defendant in His Vehicle Because He Violated District of Columbia Traffic Laws.

The temporary detention of a motorist based upon reasonable articulable suspicion that he has violated traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures. *Whren v. United States*, 517 U.S. 806, 819 (1996); *see also, Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (police officer may temporarily detain a motorist on less than probable cause where the officer has a reasonable and articulable suspicion that the motorist has committed a traffic violation). Indeed, police may make a brief investigative detention of a person upon articulable suspicion. *United States v. Nurse*, 916 F.2d 20 (D.C. Cir. 1990). If an officer has reasonable articulable suspicion that a traffic violation occurred or is in progress, a traffic stop is permissible under *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable articulable suspicion is substantially less than probable cause, but more than a mere hunch or general suspicion. *United States v. Sokolow*, 490 U.S. 1 (1989) (requiring some minimal level of objective justification). Even acts that viewed in isolation appear innocent, can, in combination, amount to articulable suspicion. *See United States v. Arvizu*, 534 U.S. 266 (2002).

Here, the officers had not only reasonable, articulable suspicion to believe that the defendant had violated traffic regulations, but also probable cause to believe that such violations occurred. First, under the D.C. Municipal Regulations, a placard "shall be displayed upon the dashboard of the vehicle to be clearly visible from the outside whenever the vehicle is parked in

the reserved space." D.C.M.R. § 18-2715. Similarly, under the Code of Virginia (the defendant's vehicle ultimately had a Virginia tag affixed to the rear), "[l]icense plates assigned to a motor vehicle, other than a moped, motorcycle, autocycle, tractor truck, trailer, or semitrailer, or to persons licensed as motor vehicle dealers or transporters of unladen vehicles, shall be attached to the *front* and the rear of the vehicle. Va. Code Ann. § 46.2-715 (West) (emphasis added); *see also* D.C.M.R. § 18-422.1 (requiring front and rear display of current identification tags); § 18-422.3 (describing that a vehicle owned by a non-resident must confirm to the requirements of the issuing jurisdiction).

The stop in this case was lawful. The officers observed that the vehicle the defendant was driving was parked, specifically backed into, a parking space so the front windshield was facing the officers in a handicap parking spot without a handicap placard. As such, again the officers had probable cause to believe that the defendant was in violation of D.C.M.R. § 18-2715. In addition, officers observed the defendant sitting as the sole occupant driver of a grey 2020 Audi sedan with a rear Virginia tag of B80083 but no front tags. Officers therefore had the requisite basis to believe that the defendant had further violated traffic laws for failing to display a front tag. *See*, D.C.M.R. § 18-422; Va. Code Ann. § 46.2-715. At this point, when the officers had not only reasonable articulable suspicion of a motor vehicle code violations, but probable cause, the officers were able to order the defendant out of the vehicle. *See Maryland v. Wilson*, 519 U.S. 408 (1997) (When making a *Terry* stop of a vehicle, the police may order the driver and the passengers out of the vehicle); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Indeed, "The Supreme Court and this Court have repeatedly recognized that a car stop is 'one of the more perilous duties imposed on law enforcement officers.'" *United States v. Washington,* 559 F.3d 573, 576 (D.C. Cir. 2009) (citing *United States v. Holmes,* 385 F.3d 786, 791 (D.C. Cir. 2004).

"Because of that inherent danger, police may order the driver and passengers out of the car during a traffic stop." *Id*. (citing *Wilson,* 519 U.S. at  413 n. 1;  *Mimms,* 434 U.S. at 111 n. 6; *United States v. Bullock,* 510 F.3d 342, 344–45 (D.C. Cir. 2007)). In conducting a *Terry* stop of the defendant's vehicle, officers lawfully could have asked the defendant to step out of the vehicle. However, the situation evolved before the officers could have ever stepped the defendant out of the car.

### B.  The Officers' Developed Probable Cause to Search the Vehicle and Detain the Defendant.

The mere observation of an object in plain view is not a search and police officers may observe evidence in plain view without violating the Fourth Amendment. *James v. United States*, 418 F.2d 1150, 1151 n.1 (D.C. Cir. 1969). The plain view exception to the warrant requirement was first recognized in *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citing cases). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.,* if 'its incriminating character [is not] 'immediately apparent',' the plain-view doctrine cannot justify its seizure." *Id*. (citing *Horton,* 496 U.S., at 136; *Arizona v. Hicks,* 480 U.S. 321(1987)). When seeing an item in plain view involves looking inside a car, the fact that an officer adjusts position, peers through a window, or uses a flashlight does not change the analysis. *See United States v. Dunn*, 480 U.S. 294, 305 (1987) ("[T]he officers' use of the beam of a flashlight . . . did not transform their observations into an unreasonable search . . . ."); *Texas v. Brown*, 460 U.S. 730, 740 (1983) (denying motion to suppress and finding that the fact that an officer changed his position and bent

7

down at an angle so he could see what was inside and then found contraband did not violate the Fourth Amendment; "The general public could peer into the interior of Brown's automobile from any number of angles; there is no reason [an officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen."). Indeed, "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968).

Here, the officers lawfully approached the defendant's vehicle for not displaying a handicap placard in a handicap parking spot and not having a front tag. During the course of the stop, the officers were permitted to step the defendant out of the vehicle under *Pennsylvania v. Mimms*. However, as the officers were walking toward the vehicle, in addition to observing the defendant's face becoming wide-eyed, dipping his right arm down, he began to roll up the window. This is consistent with an individual attempting to hide or move something away from observation. Given the defendant's actions to that point, the officers appropriately told the defendant to keep the window down so they could speak with him. Officer Smith stood at the driver side window speaking with the defendant, and while looking down around the driver door area – in an area where he was lawfully present – observed a box off ammunition with "RIFLE" written on it. Officer Smith's use of a flashlight did not transform his "observations into an unreasonable search within the meaning of the Fourth Amendment." *See*, *Dunn*, 480 U.S. at 305; *Brown,* 460 U.S. at 739–740.

Given the totality of the circumstances, officers believed there was contraband in the ammunition box and a firearm in the vehicle and gave the code word for a firearm.[2] The officers not only had every right to step the defendant out of the vehicle, but the circumstances also gave them ample probable cause to search the vehicle and investigate further. *Harris*, 390 U.S. at 236. Despite the presence of this probable cause, the defendant continued to behave obstructively. For example, the defendant tried to roll up his window to avoid officer contact. Officers were able to unlock the car before the window was rolled up and it was during this time that Officer Jeskie, who had entered the car from the passenger side to help remove the defendant from the vehicle, observed the floorplate of the firearm. wedged between the driver's seat and center console where the defendant had been leaning. Moments later, Officer Jeskie was able to see the entire firearm.

The ultimate arrest of the defendant was also supported by probable cause. It is axiomatic that the police may arrest someone without first obtaining an arrest warrant where the police have probable cause to believe that person is committing or has committed a criminal offense. *Florida v. White*, 526 U.S. 559 (1999). Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his or her training and experience that would lead the officer to believe that a criminal offense had been or is being committed. *See United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981); *Brinegar v. United States*, 338 U.S. 160 (1949). In this case, when the officers observed a firearm ammunition box in the driver side door panel pocket, of which the defendant was the driver and sole occupant, coupled with the defendant's demeanor and uncooperative conduct, law enforcement had probable cause

---

[2] The fact that officers alerted to the presence of a firearm, having not yet even seen the firearm, underscores the officer's training and experience. Just like when there is smoke, there can often be fire, when a suspect behaves oddly, attempting to shield himself from law enforcement and officers observe possible firearm ammunition in plain view, it is not unreasonable to suspect the presence of an actual firearm. This is borne out by their actions.

to believe the defendant was, at the very least in possession of unregistered ammunition. *See* §
D.C. Code 7-2506.01 (criminalizing the unlicensed or unregistered possession of ammunition).
Upon discovery of the firearm, incident to the stop and detention, law enforcement obtained
probable cause to arrest the defendant for the gun.

### C.   Ic. __This Case is Distinguishable from *United States v. Delaney*.__

The defendant asks the court to focus on a recent D.C. Circuit case, *United States v.
Delaney*, 955 F.3d 1077 (D.C. Cir. 2020) ("*Delaney*"). In *Delaney*, MPD officers approached the
defendant while he was seated in a parked car within a parking lot on the 5300 block of Drake
Place, SE. It was New Year's Eve, and officers were on patrol in the area due to the large amount
of gunshot calls due to the holiday celebrations. Right after midnight, the officers heard gunfire
that appeared close in proximity to their respective location and eventually drove into an alley that
was a parking lot for an apartment building. *Id* at 1078-1080.

The parking lot was separated from the street by a black fence, which was wide enough to
allow a vehicle to pass through on either side. Upon entering the lot, the officers turned on their
bright white "take-down" light to illuminate dark areas. *Id.* at 1083. The officers then saw the
defendant and a woman in a parked car, with multiple empty parking spots around them. The two
individuals began kissing, which was odd to the officers because the defendant was staring at them
the whole time the defendant was kissing his companion. Officers approached and told the
defendant to open the door, leading to the recovery of a firearm. The police were parked
diagonally, about three feet from the defendant's vehicle, where the defendant's jeep could exit
the lot, but it would "take some maneuvering." *Id.* The question for the *Delaney* Court was whether
the defendant was seized prior to the officer's approach of the vehicle. *Id.* at 1082. The Court
ultimately held that the defendant was seized when the officers parked, and the defendant thus

submitted to their show of authority.

The Court in *Delaney* determined, after a fact intensive inquiry, that parking a police vehicle in a way that restricts any meaningful movement, along with the use of a "take-down" light, in a dark alley at night, was sufficient to qualify as a seizure. In determining if the officers had reasonable articulable suspicion at the time of the seizure, the Court even acknowledged the "close call" in the case. *Id.* at 1085. However, in this case, two motor vehicle violations were apparent before the officers stopped the car, "take-down" lights were not utilized, and the parking lot was well-lit and less constrained.  Furthermore, unlike in *Delaney*, here, the defendant made odd and furtive movements. While *Delaney* stands for the proposition that certain factors can transform a consensual encounter into a seizure, this case is easily distinguishable. Unlike in *Delaney*, where officers approached a vehicle based on a curious hunch, here, officers had probable cause immediately upon witness two separate traffic violations. As such, the defense's argument that the Court should find this case comparable to *Delaney* is misplaced. The officers in this encounter did not violate the Fourth Amendment and the evidence should not be suppressed.

## II.       THERE WAS NO FIFTH OR SIXTH AMENDMENT VIOLATION.

In his motion, the defendant does not identify any particular statements he seeks to suppress and argues that the Court must suppress "any and all uncounseled statements" made by him under the Fifth and Sixth Amendments. Def. Mot. at 4. The government is unclear on what specific statements the defendant seeks to suppress given that a review of the  officers' body-worn cameras (hereinafter "BWC") in scene shows the defendant made numerous statements over the course of approximately twenty minutes, including cordial or irrelevant banter between himself and police officers. The government nevertheless attempts to identify a specific colloquy that it would seek to introduce and respond accordingly.

After the defendant's arrest, the defendant engaged in the following interaction with law enforcement:

> Officer Dean: "The only thing I can do is promise you is when we talk to the attorney we will tell them you were a very cooperative man and very respectful"
>
> Officer Smith (while taking prisoner property): "Got some money, got a couple twenties"
>
> Officer Dean: "How was you about to spend New Years?"
>
> Defendant: "About to go to MGM man"
>
> Officer Dean: Inaudible
>
> Defendant: "Damn shit fucked my head up."
>
> Defendant: "I mean you know how the streets is, man. You ain't about to ride around naked. Dudes drive up, pull up to you."

*See* Exhibit C (video clip from Officer Dean's's body worn camera). Presumably, the defendant seeks to suppress this statement, where the defendant spontaneously references the need to carry a firearm, albeit implicitly.

## A. <u>The Defendant's Statements Were Made Voluntarily.</u>

The Supreme Court has indicated that the inquiry into whether a statement is obtained voluntarily should be determined with reference to the totality of the circumstances, and that the ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). If a suspect gives a statement solely as a result of an internal condition, e.g., insanity or intoxication, there also is no constitutional violation. *Connelly*, 479 U.S. at 167. *Compare United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (no coercive

police conduct where defendant agreed to an interview with agents, agents asked "straightforward" questions in "conversational tones"; defendant was not restrained; interview lasted less than an hour; defendant questioned in a hospital and not in a police-dominated atmosphere; defendant was not tricked into answer questions; defendant's refusal to consent to a search of his vehicle showed his will was not overborne), *with Little v. United States*, 125 A.3d 1119, 1133 (D.C. 2015) (defendant chained to the ground and chair, denied counsel when requested, threatened that he would be raped if he went to jail, and accused of crimes officers knew he did not commit, was coerced into confessing).

Further, *Miranda* set forth prophylactic rules, based on the Constitution, to protect a suspect's Fifth Amendment rights. *See United States v. Miranda,* 384 U.S. 436 (1966); *Dickerson v. United States*, 530 U.S. 428 (2000). Essentially, *Miranda* requires that suspects in police custody be advised of their rights before they are subjected to interrogation, and that any statement be the product of a knowing, intelligent, and voluntary waiver of those rights. *Id.*

Miranda is inapplicable where the suspect is in custody, but nevertheless volunteers a statement in the absence of interrogation. *Miranda*, 384 U.S. at 478; *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "Interrogation" includes "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the subject." *Innis*, 446 U.S. at 300-01 ("Interrogation as conceptualized . . . must reflect a measure of compulsion above and beyond that inherent in custody itself.") (internal punctuation omitted). Even express questioning will not be "interrogation" if it is not reasonably likely to elicit an incriminating response. *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997).

Here, the defendant points to nothing to suggest that his statements on scene or after arrest were involuntary. On scene, the officers spoke to the defendant in a non-threatening,

conversational tone while preparing for him to be transported. Although the defendant was not advised of his rights,  the initial questions asked were routine, traditional booking questions. The conversation transitioned into innocuous banter, including law enforcement politely asking the defendant what his plans were that evening, which also happened to be New Year's Eve.

By way of the Sixth Amendment, nothing occurred that overborne the defendant's will nor does the defendant attempt to bolster that contention. With respect to *Miranda*, the defendant's statement is unquestionable spontaneous. Per the video, as well as the above transcript, law enforcement asked the defendant an innocuous question about his plans that evening. Nothing about that interaction, or the question itself, would suggest to a trained officer that it would result in an incriminating response about a firearm nor is there any evidence to suggest that the officer intended it to elicit such a response. *Compare United States v. Morton,* 391 F.3d 274, 276 (D.C. Cir. 2004) (Where the government admitted Morton was in custody when she made incriminating statements and that no officer had informed Morton of her rights under *Miranda*. Morton did not dispute that she initiated the conversation with Officer Parker and conceded no questions were asked. Morton argued the Officer's conduct was equivalent to interrogation because the officer should have known the comments would illicit an incriminating response. The Court found the Officer did not compel or encourage Morton to incriminate herself and that the officer's statements were responsive to Morton's comments and was not under interrogation). Accordingly, the defendant's statements should not be suppressed.

## **CONCLUSION**

WHEREFORE, for the reasons stated above and for any other reason presented at the hearing or in the record, the United States respectfully requests that the defendant's Motion to Suppress be DENIED.

Dated: October 29, 2021                    Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney

By:        */s/ Samuel Frey*
Samuel Frey
Assistant United States Attorney
PA Bar No. 321856
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7124
Samuel.Frey2@usdoj.gov

## CERTIFICATE OF SERVICE

On this 29th day of October, 2021, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.

/s/ Samuel Frey
Samuel Frey
Assistant United States Attorney